# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| v. | ) | 2:10-cr-129 |
| | ) | |
| TRISHA L. BAKER, | ) | |
| | ) | |
| Defendant. | ) | |

## FINDINGS AND RULINGS

Although the decision of the United States Supreme Court in *United States v. Booker*, 543 U.S. 220 (2005), held that the Sentencing Guidelines are no longer mandatory, the "remedial majority" opinion in the case instructs that the Sentencing Guidelines must still be taken into account pursuant to 18 U.S.C. § 3553(a) when fashioning an appropriate sentence. *See Booker*, 543 U.S. at 247;[1] *see also Gall v. United States*, 552 U.S. 38 (2007). It remains appropriate, therefore, in this case to consider and resolve any Sentencing Guidelines disputes in order to determine a sentencing range for Defendant, which will then be one of the § 3553(a) factors to be considered in imposing an appropriate sentence.

On June 29, 2010, Defendant was indicted on a one count criminal indictment in the mater *sub judice*. Doc. No. 1. Count one alleges that on or around March 2009 to in or around May 2009 in the Western District of Pennsylvania, Defendant did knowingly conspire with intent

---

[1] Title 28, United States Code, § 3553(a)(4) requires the Guidelines sentencing range to be considered as one of the factors in sentencing. Subsection (a)(6) requires the sentencing court to consider "the need to avoid unwarranted sentence disparities"; and Subsection (c) requires the sentencing court to state the reasons for the imposition of a particular sentence, including the reasons for any deviation from the Guidelines sentencing range and the effects of the other § 3553(a) factors in setting the sentence.

to commit offenses against the United States, specifically to make and pass counterfeit currency, in violation of Title 18, United States Code, section 371. Defendant pled guilty to the criminal indictment on June 28, 2011. On that date, sentencing was scheduled to occur on October 28, 2011, and a Presentence Investigation Report ("PSIR") was ordered. Objections to the PSIR were filed by both the government and by Defendant. *See* Doc. Nos. 240 and 242. On October 19, 2011, the sentencing hearing was rescheduled to November 8, 2011, in order to conduct an evidentiary hearing on said objections on the date and time originally scheduled for the sentencing hearing. On October 27, 2011, Defendant filed a sentencing memorandum in advance of the evidentiary hearing. Doc. No. 245. On October 28, 2011, an evidentiary hearing was conducted, during which Tiphany Ohler and United States Secret Service Special Agent Mark Kernan testified on behalf of the government, and Defendant testified on her own behalf. The parties were each afforded an adequate opportunity to present relevant information regarding the factors in dispute. On November 1, 2011, the government's sentencing memorandum was filed. Doc. No. 248.

In accordance with §6A1.3 of the United States Sentencing Guidelines ("USSG") and Local Criminal Rule of Court 32.1(H), the Court issue the following Findings and Rulings with respect to the disputed USSG sentencing factors

**Findings and Rulings Regarding Offense Level Computation**

Federal Rule of Criminal Procedure 32(i)(3)(B) requires the Court to rule upon any disputed portion of the PSIR that will affect sentencing, or determine that such a ruling would be unnecessary because either the disputed portion will not affect sentencing or will not be considered in sentencing. In determining a defendant's sentence, a district court must give

meaningful consideration to the factors contained in 18 U.S.C. § 3553(a); *United States v. Cooper*, 437 F.3d 324, 329 (3d Cir. 2006). The relevant factors are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed --
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . .

*Id.* (citing 18 U.S.C. § 3553(a)). Since the Guidelines provide a natural starting point for the determination of the appropriate level of punishment for criminal conduct, the Court will begin by noting the appropriate guideline range. *See Cooper*, 437 F.3d at 331.

A.  Base Offense Level

On September 26, 2011, a PSIR was prepared by the United States Probation Office for the Western District of Pennsylvania. *See* PSIR filed at Doc. No. 235. The applicable offense guideline for Count I - Conspiracy, in violation of 18 U.S.C. § 371, is found at USSG § 2X1.1. Pursuant to USSG § 2X1.1(a), the base offense level for violation of 18 U.S.C. § 371 is determined by the substantive offense of the conspiracy. PSIR at ¶ 17. Making Counterfeit Obligations or Securities, in violation of 18 U.S.C. § 471; and Passing and Uttering Counterfeit

Obligations or Securities, in violation of 18 U.S.C. § 472, are the substantive offenses of the conspiracy and the applicable offense level for both is found at USSG § 2B5.1. Pursuant to USSG § 2B5.1(a), and without the objection of Defendant, the calculation of the advisory sentencing guideline range begins with a base offense level of nine (9). PSIR at ¶ 18. The Court turns to the specific offense characteristics included in the PSIR that were the subjects of objection by the parties.

B.   <u>Specific Offense Characteristic: Face Value of Counterfeit Currency</u>

Pursuant to USSG § 2B5.1(b)(1)(A), if the face value of the counterfeit items exceeded $2,000 but did not exceed $5,000, the offense level must be increased by one (1) level. PSIR ar ¶ 19. With its response to the PSIR, the government objects to application of USSG § 2B5.1(b)(1)(A), instead arguing that USSG § 2B5.1(b)(1)(B) should apply. *See* Doc. No. 242 at ¶ B. Pursuant to USSG § 2B5.1(b)(1)(B), if the face value of the counterfeit items exceeded $5,000, the offense level must be increased by the corresponding number of levels from the table in USSG § 2B1.1 (Theft, Property Destruction, and Fraud) for the amount of the face value.

The government contends that Defendant was responsible for conspiring to produce counterfeit currency with a face value of $25,000.00, and therefore, should receive an increase of four (4) levels, as opposed to one (1). Doc. No. 242 at ¶ B. During the hearing, Special Agent Kernan testified that when he interviewed Defendant on June 16, 2009, Defendant informed him that she had produced approximately $25,000.00 in counterfeit currency since January, 2009. On cross examination, however, Kernan acknowledged that law enforcement recovered counterfeit currency with a face value of approximately $4,000. For her part, Defendant denied that she produced $25,000.00 in counterfeit currency, and further denied that she ever told Special Agent

4

Kernan that she did.

A total of five defendants were charged under the criminal indictment in this matter: Defendants Baker, Kimberly Faber, Sahaua Gervasoni, Tessa Hartless, and Tiphany Ohler, each of whom has pled guilty. PSIR reports were prepared for each individual Defendant in advance of their respective sentencing hearings. As part of the PSIR calculations regarding the appropriate offense level, each of Defendant's co-conspirators (Faber, Gervasoni, Hartless, and Ohler), were deemed responsible for counterfeit currency with a face value of between $2,000 and $5,000. The government's positions with respect to the PSIR calculations in these other cases were consistent with one another. More particularly, the government had no objection to the application of USSG § 2B5.1(b)(1)(A) with its increase of one (1) level for the sentence advisory range for Defendant's co-conspirators, nor did it attempt to argue that USSG § 2B5.1(b)(1)(B) was appropriate for any of the other defendants.

In sum, the Court finds that there is conflicting and therefore insufficient evidence to justify application of the four (4) level increase pursuant to USSG § 2B5.1(b)(1)(B), as opposed to the one (1) level increase pursuant to USSG § 2B5.1(b)(1)(A). Accordingly, the government's objection with respect to paragraph 19 of the PSIR is overruled. For the purpose of calculating an appropriate offense level with the applicable adjustments, the base offense level will be increased by one (1) level based upon a face value of the counterfeit items of between $2,000 and $5,000.

C. <u>Specific Offense Characteristic: Custody or Control of Counterfeiting Device/Materials</u>

Pursuant to USSG § 2B5.1(b)(2)(A), if a defendant manufactured or produced any counterfeit obligation or security of the United States, or possessed or had custody of or control

5

over a counterfeiting device or materials used for counterfeiting, the offense level must be increased by two (2) levels. According to the PSIR, Defendant had custody of or control over a multi-functioning printing device, specifically, a Lexmark X2600 3-in-1 printer, model number 4433-001, bearing serial number 000GA221773, which was used to produce the counterfeit federal reserve notes as part of the conspiracy. PSIR at ¶ 20.

Defendant objects to the two (2) level increase by contending that the device was not in her possession, custody, or control, "as the Lexmark was in the possession of Tessa Hartless." Doc. No. 240 at ¶ 5. In view of the evidence presented during the evidentiary hearing and for the reasons that follow, the Court finds that the two (2) level increase is appropriately applicable under USSG § 2B5.1(b)(2)(A).

Tiphany Ohler testified during the evidentiary hearing regarding her involvement in the counterfeiting conspiracy, and provided testimony relevant to the issue of Defendant's role in the manufacture or production of counterfeit obligations. In relevant part, Ohler testified that the counterfeiting operations were conducted in the house in Walston, PA, where Defendant was living with her boyfriend. Defendant manufactured the counterfeit currency in the basement of her boyfriend's house by, *inter alia*, photocopying both the front side and back side of legitimate currency, cutting the copies down to size, gluing them together with spray adhesive, and ironing them to ensure a uniformly flat adhesion. Ohler personally witnessed Defendant manufacture the counterfeit currency on a number of occasions, and, more particularly, it was Defendant who personally performed each of these steps. When Ohler attempted "a couple of times" to assist with cutting the currency to the proper size, she "wasn't steady enough to get the lines straight." Ohler testified that others were present on occasion in the basement as well, more specifically

Tessa Hartless and Sahaua Gervasoni, and that they were all present to "get high pretty much."

Ohler also testified regarding Defendant's possession or custody over a counterfeiting device or materials used for counterfeiting. According to Ohler, the printer utilized by Defendant while making copies of currency was a Lexmark printer. Additionally, Defendant "always carried it with her in the Jeep everywhere [Defendant and Ohler] went." Defendant kept the printer in a blue duffel bag, a picture of which was admitted into evidence during the hearing as Government Exhibit 1 ("GE-1"). Further, Ohler testified that she accompanied Defendant to a Wal-Mart store in order to purchase other supplies that were used in the counterfeiting operation. Ohler herself was not permitted into the store due to a previous incident of defiant trespass and retail theft, therefore it was Defendant who entered and purchased the paper and cans of adhesive spray that were used in the counterfeiting.

During the evidentiary hearing, Special Agent Kernan testified regarding his May 12, 2009, interview with Tessa Hartless conducted as part of his investigation into the counterfeiting conspiracy. Hartless informed Kernan that the counterfeiting operation was conducted at the residence of Troy Roney, Defendant's then-boyfriend, where Defendant was staying in the months of April and May of 2009. Through other investigative efforts, Special Agent Kernan determined Roney's address to be 77 Church Road in Walston, PA. According to Hartless, the counterfeit currency was made in the basement of Roney's residence using, *inter alia*, a copier and spray glue.

Special Agent Kernan also testified regarding Defendant's possession of counterfeiting materials. Kernan interviewed Defendant on June 16, 2009, in Alex Zemko's apartment in Yatesboro, PA where Defendant had stayed the night before. A search of the apartment rear

bedroom where Defendant's possessions were stored was conducted, which resulted in the seizure of a can of spray glue (offered and admitted during the hearing as GE-4), paper printed with text utilized in counterfeiting currency as counterfeit security thread (GE-5 and GE-8), scraps of paper printed with counterfeit security thread information (GE-6), and scraps of actual counterfeit currency (GE-7). During the course of the interview, Defendant admitted to Special Agent Kernan that the currency was counterfeited in the basement of the house by owned by Troy Roney in Walston, PA, and that a Lexmark printer was used.

Special Agent Kernan further testified regarding Defendant's custody or control over a counterfeiting device or materials used in counterfeiting. According to Special Agent Kernan, Hartless contacted him on May 25, 2009, to inform him that someone had placed a blue duffel bag under her trailer. Hartless was told to contact the Pennsylvania State Police, who recovered the Lexmark printer from the bag and took it into evidence. While she did not know who placed the printer there, Hartless told Kernan that she did not do it, and that she suspected Baker as the culprit. Baker testified that the printer was not hers, but rather it belonged to Tessa Hartless.

Here, the Court has no difficulty whatsoever in finding that the enhancement at USSG § 2B5.1(b)(2) applies. USSG § 2B5.1(b)(2) provides:

> If the defendant (A) manufactured or produced any counterfeit obligation or security of the United States, or possessed or had custody of or control over a counterfeiting device or materials used for counterfeiting; or (B) controlled or possessed (i) counterfeiting paper similar to a distinctive paper; (ii) genuine United States currency paper from which the ink or other distinctive counterfeit deterrent has been completely or partially removed; or (iii) a feature or device essentially identical to a distinctive counterfeit deterrent, increase by **2** levels.

Furthermore, the Commentary that section notes the following:

> <u>Background</u>: Possession of counterfeiting devices to copy obligations (including securities) of the United States is treated as an aggravated form of counterfeiting

because of the sophistication and planning involved in manufacturing counterfeit obligations and the public policy interest in protecting the integrity of government obligations. Similarly, an enhancement is provided for a defendant who produces, rather than merely passes, the counterfeit items.

The Lexmark printer had been maintained in the basement of the house where Defendant was living, and was used by her in the process of manufacturing counterfeit currency. Further, Defendant would keep the printer with her in a duffel bag as she drove Ohler and others to various stores to pass the counterfeit money. Notwithstanding Defendant's self-serving claim that the printer belonged to Tessa Hartless, which itself strains credulity given the fact that most of the counterfeiting occurred in the basement of Baker's boyfriend's house, she clearly possessed or had custody and/or control of the Lexmark printer that was being used to counterfeit currency. Furthermore, there is no dispute that Defendant possessed or had custody of or control over other materials that were used. Defendant personally purchased the paper and the spray adhesive, and had them in her possession when she was interviewed by law enforcement agents on June 16, 2009. Defendant herself admitted that early attempts to counterfeit currency were not successful, and that through continued efforts in improving the manufacturing methods, counterfeit currency was ultimately produced that was successfully passed to numerous businesses. As such, the enhancement is appropriate given the sophistication and planning of Defendant to make passable counterfeit currency. Furthermore, from the evidence before the Court, Defendant's role was in the manufacture of the currency itself, as it appears that she did not pass the currency herself.

In sum, the Court finds that USSG § 2B5.1(b)(2)(A) applies and that Defendant's base offense level should be increased by 2 levels. Defendant admitted to manufacturing or producing counterfeit United States currency. Further, the Court finds that Baker possessed or had custody

of or control over a counterfeiting device and materials used for counterfeiting. Pursunat to USSG § 2B5.1(b)(3), if subsection (b)(2)(A) applies, which it does, and the offense level is less than level 15, the offense level should be increased to 15. The resulting offense level subtotal is 12. Accordingly, the offense level is increased to 15.

D.      Adjustment for Role in Offense: Organizer or Leader of Criminal Activity

Pursuant to USSG § 3B1.1(a), if Defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, the offense score must be increased by 4 levels. The PSIR notes that the enhancement applies. PSIR ¶ 22. Defendant disputes that she was an organizer or leader. Doc. No. 240 at ¶ 7. As there is no dispute that the activity involved five participants, the question turns upon the determination of whether Defendant was the leader or organizer. The Court finds that she was.

Ohler testified that she was brought into the conspiracy through Defendant. Initially, Ohler was not even aware of the plan when she first became involved. Ohler met Defendant through a mutual friend, Alex Zemko, in early 2009. In or around March of 2009, Defendant gave Ohler a counterfeit one hundred dollar ($100) bill and instructed her to drive Defendant's Jeep Cherokee to a local gas station, fill the vehicle's gas tank, and purchase a pack of cigarettes. Defendant did not inform Ohler that the currency was counterfeit, and Ohler did not know that it was. Ohler did as she was instructed, and was able to purchase the gasoline and cigarettes without incident. Only after returning the vehicle to Defendant did Ohler learn that the currency she used to make the purchases was counterfeit. At that time, Defendant asked Ohler to continue to assist her in uttering counterfeit currency in order to make purchases and receive legitimate currency in exchange to be used for the purchase of drugs. Ohler readily agreed. Ohler came to

know both Tessa Hartless and Sahaua Gervasoni through her association with Defendant in the course of the counterfeiting scheme.

Ohler testified regarding the general method of the co-conspirators under their scheme. She testified that Defendant always took control of the counterfeit currency once it was produced. In passing the counterfeit currency, Defendant would drive Ohler and the others to various stores in an around the area in Defendant's Jeep Cherokee (bringing with them the Lexmark printer in the duffel bag). Defendant would give the counterfeit currency to Ohler and the others who would then make a relatively small purchase, and receive change. The legitimate change currency would be given to Defendant, who would use it to purchase drugs for the group to get high. According to Ohler, the goal was not the underlying purchase itself, but to receive as much change as possible in order to accumulate enough legitimate money to purchase narcotic drugs. As a supplement to Ohler's testimony, the government introduced GE-2, a parking lot surveillance photograph of Ohler exiting one of the stores in which she passed counterfeit currency. Also clearly visible in the photograph was Defendant's Jeep Cherokee, which Ohler identified as the vehicle in which she traveled with Defendant to the store.

Special Agent Kernan also testified regarding Defendant's role as an organizer or leader in the scheme, as developed through his investigation. GE-3, a video surveillance photograph of Tessa Hartless inside a gas station convenience store to pass counterfeit currency, was admitted into evidence. The parking lot was visible in the photograph through the window, and Defendant's vehicle was clearly in the parking lot. Additionally, Hartless when interviewed by Special Agent Kernan on May 14, 2009, told him that on May 13, 2009 (the day before), Defendant came to Hartless' trailer to cut counterfeit twenty dollar ($20) bills. Hartless then

11

accompanied Defendant to meet with Kimberly Faber, where Defendant gave Faber $400 in counterfeit currency. All three then departed Faber's residence and Defendant drove them to Indiana County to purchase illegal narcotics. Hartless contacted Special Agent Kernan again on June 10, 2009, and informed him that she had recently been asked by Defendant whether she could help Defendant in "moving" $125,000 in counterfeit currency. Hartlesss considered the request to be a test by Defendant in view of her belief that Defendant was aware that Hartless had previously met with law enforcement officers, and she declined the offer to assist Defendant.

Special Agent Kernan interviewed co-conspirator Sauhua Gervasoni on June 11, 2009. Gervasoni was recruited into the counterfeiting operation by Defendant, who claimed that she needed Gervasoni's assistance in passing counterfeit money. Gervasoni agreed, and joined the conspiracy. Consistent with the method described by Ohler in her testimony, Gervasoni would receive counterfeit currency from Defendant to spend in stores and receive legitimate cash in return. After each transaction, Gervasoni would return all of the real money to Defendant.

Defendant disputed the notion that she was an organizer or leader. Defendant disputed that she alone was the sole person who manufactured the currency, and further disputed the testimony that she maintained control over the counterfeit currency or the legitimate currency but for those brief periods in which purchases were being made in the stores. While she does not attribute the original idea to anyone in particular, Defendant did admit that the idea stemmed from jealously over her boyfriend's (Troy Roney) own success in making and passing counterfeit notes.

Through the testimony and evidence overall, the Court finds that Defendant was the organizer or leader of this criminal conspiracy. The information from the co-conspirators

12

adduced through the investigation regarding Defendant's leadership was consistent, in that it was Defendant who recruited participants, it was Defendant who would drive to the various stores, and it was Defendant who would individually distribute the counterfeit currency and collect the legitimate currency obtained as change.  Furthermore, the evidence is clear that Defendant was involved through every phase of the operation and in each incident, while the other co-conspirators' involvement was more sporadic.  The primary locus of the counterfeiting operation was the house where Defendant was living, and the idea was inspired by similar criminal activity perpetrated by Defendant's boyfriend.  Notwithstanding Defendant's self-serving efforts to diminish her role, the quantum of evidence demonstrates her organizer and leadership role.  As such, the Court finds that USSG § 3B1.1(a) applies and that the offense level will be increased by four levels.

## Findings and Rulings Regarding Criminal History Computation

The Comprehensive Crime Control Act, 18 U.S.C. § 3553(a)(2), sets forth four purposes of sentencing.  A defendant's record of past criminal conduct is directly relevant to those purposes.  USSG, Ch. 4, Pt. A, Introductory Comment.  A defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment.  *Id*.  To protect the public from further crimes of the particular defendant, the likelihood of recidivism and future criminal behavior must be considered.  *Id*.  The specific factors included in § 4A1.1are consistent with the extant empirical research assessing recidivism and patterns of career criminal behavior.  § 4A1.1 states in relevant part:

<u>Criminal History Category</u>

The total points from subsections (a) through (e) determine the criminal history category in the Sentencing Table in Chapter Five, Part A.

(a) Add 3 points for each prior sentence of imprisonment exceeding one year and one month.

(b) Add 2 points for each prior sentence of imprisonment of at least sixty days not counted in (a).

(c) Add 1 point for each prior sentence not counted in (a) or (b), up to a total of four points for this subsection.

(d) Add 2 points if the defendant committed the instant offense while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status.

Here, the Probation and Pretrial Services Office calculated a criminal history score of 8 points, with 3 points being included under § 4A1.1(a) for a conviction in the Jefferson County Court of Common Pleas at case number CR-89-2011 (PSIR ¶ 40), and an additional 5 points being calculated under § 4A1.1(c) for the following convictions:

i) On November 3, 2005, Defendant pled guilty to Wanton Endangerment in the second degree before the Warren District Court, in Bowling Green, Kentucky, at case number 05-F-00086. Defendant was sentenced on the same day to 180 days imprisonment, which was suspended, and ordered to pay costs. (PSIR ¶ 32.);

ii) On June 15, 2006, Defendant pled guilty to Assault in the fourth degree with minor injury before the Butler District Court, in Morgantown, Kentucky at case number 06-M-00102. Defendant was ordered to 30 days imprisonment, which was suspended, and ordered to pay costs. (PSIR ¶ 33);

iii) On April 21, 2008, Defendant was found guilty following a trial for one count of Theft by Unlawful taking - Movable Property, and one count of Receiving Stolen Property before the Indiana County Court of Common Pleas at case number CR-1179-2007. Defendant was sentenced on June 23, 2008, at count I to 2 years of probation with fines and costs, and at count 2 to 2 years of probation to run concurrently. (PSIR ¶ 37);

iv) On August 17, 2009, Defendant pled guilty to two counts of Possession of a Cointrolled Substance before the Allegheny County Court of Common Please at case number CR-11940-2009. Defendant was ordered to 6 months of probation at each count, to run concurrently. (PSIR ¶ 38); and

> v) On April 21, 2008, Defendant was found guilty following a trial for one count of Criminal Mischief, a summary offense, before the Magisterial District Court (54-3-01) in Jefferson County, Pennsylvania at case number NT-264-09. Defendant was sentenced to fines, costs, and restitution. (PSIR ¶ 41).

While the criminal history points for these offenses total 8, the total number of points that can be included under § 4A1.1(c) is 4, which, in this case, would lower the total of the criminal history points to 7. That total is increased by 2 pursuant to § 4A1.1(d) because at the time of the instant offense, Defendant was on probation for the sentence imposed on June 23, 2008, by the Court of Common Pleas of Indiana County noted above. *See* PSIR ¶ 42. The total of Defendant's criminal history points is 9. According to the Sentencing Table at USSG, Chapter 5, Part A, 9 criminal history points establish a criminal history category of IV. PSIR ¶ 43.

Defendant objects to the inclusion of the Criminal Mischief summary offense in the criminal history point total. Doc. No. 240. According to Defendant, that summary charge was withdrawn after an appeal was filed. *Id.*; *see also* Doc. No. 245-1 at p. 8. In response to Defendant's objection in this regard, the Probation and Pretrial Services Office agreed that the citation was withdrawn, but further notes that the exclusion of that point will have no bearing on the criminal history point calculation or the corresponding criminal history category. Doc. No. 244. As the Addendum to the PSIR noted, "The defendant has four other convictions which received a criminal history category point, and one prior conviction which received 3 criminal history points, resulting in a subtotal criminal history category score of 7. 2 points were added to the defendant's criminal history category score because she committed the instant offense while on probation for the sentence imposed at No. 1179 CRIM 2007, through the Indiana County Court of Common Pleas. [Even accepting Defendant's objection and not including the point for the summary offense] [t]he total of the defendant's criminal history points is still (IV)." Doc.

No. 244. The Court agrees. It will not consider the 1 point reflected in PSIR ¶ 41, but that the total criminal history score for Defendant remains at 9, and her criminal history category at IV.

## Conclusion

Beyond those objections addressed herein, Defendant made a number of other minor objections to the PSIR, none of which will be considered by the Court in determining an appropriate sentence. Sentencing is hereby scheduled on **Tuesday, November 8, 2011**, at **1:30 p.m.**, in accordance with the foregoing findings and rulings.

So **ORDERED** this 3rd day of November, 2011.

BY THE COURT:

s/ Terrence F. McVerry
United States District Court Judge


cc:	Stephen Israel, Esquire
	Email: ispeclaw@fyi.com
		ispeclaw@myway.com

	James T. Kitchen, AUSA
	Email: jimmy.kitchen@usdoj.gov